Middleton, J.
During the period since May 2, 1945, various individuals appear to have been interested in or partial owners of the Anchor Cafe. They came and went with a frequency that added only confusion to the factual situation and it is unnecessary in considering the questions now before this court to give further attention to them. It is sufficient to note that Medio Pioramonte appears to have been interested in the business at all times under consideration. The said Pioramonte also operated an independent juke box and pinball machine business under the name of Exchange Novelty Company on the cafe premises. Charles Wallace, husband of Jessie Wallace, appears to have had some interest with Pioramonte in the juke box and pinball machine business.
Jessie Wallace claims to have been a half owner *215 of the cafe business at least as early as September 1948 and to have purchased the other half interest in that business from Fioramonte on March 81, 1949.
On September 21, 1948, Fioramonte and Charles Wallace executed a note in the amount of $3S,000 to J. M. Abraham who is the plaintiff in the present case. To secure that note both Fioramonte and Charles Wallace executed a chattel mortgage in favor of Abraham which covered all equipment in the Exchange Novelty Company owned by Fioramonte and which mortgage purported to cover the following:
“All the assets, equipment not hereinafter specifically mentioned, goodwill, accounts, and business of the establishment known as the Anchor Cafe located at 137-139 South street, in the city of Akron and in the above mentioned county and state, with the following equipment: One fifty-foot bar, one thirty-foot back bar, one twelve-foot bottle cooler, one six-foot bottle cooler, two compressors, one twelve-cubic-foot refrigerator, six booths, twelve tables, forty eight chairs, one cigar case, one safe, one National cash register, and miscellaneous kitchen equipment.”
That mortgage was witnessed but not acknowledged and was filed in the office of the county recorder as a chattel mortgage but was not recorded as a mortgage on real estate.
Jessie Wallace claims to have known nothing of the execution of the note or mortgage.
On March 31, 1949, an agreement was executed by and between Fioramonte and Jessie Wallace under which Fioramonte purported to sell to Jessie Wallace his entire interest in the Anchor Cafe. That instrument enumerated many items of personal property, including equipment and stock of liquor, the ownership of which was to pass under the agreement. The *216 purchase price recited therein was $18,000. The agreement recited that the seller was the lessee of the real estate occupied by the cafe and the seller agreed to assign the lease so held by him to the buyer. The agreement recited also that the seller was the holder and owner of the liquor permits enumerated therein; that the contract of sale was conditioned upon the granting by the Department of Liquor Control of corresponding permits to the purchaser, Jessie Wallace; and that the sale was to be handled by way of escrow and should be finally effected only upon the issuance of liquor permits to Jessie Wallace, the purchaser. On March 31, 1949, consistent with the agreement of sale Fioramonte placed upon the original lease a formal assignment of it to Jessie Wallace.
The lease so held by Fioramonte was dated May 2,1945, and covered a term of five years expiring May 1, 1950. It contained the following provision with respect to assignment:
“* * * that the premises aforesaid, or any part thereof, shall not be underlet, nor shall this lease be assigned, without the consent, in writing, of the first parties, under pain of forfeiting the residue of the term hereby granted, at the election of the first parties. ’ ’
Under date of March 16, 1949, Fioramonte formally notified the Department of Liquor Control that he had entered into an agreement to sell the Anchor Cafe to Jessie Wallace; and that he was surrendering his liquor permits and was enclosing them with the communication with the request that they be cancelled without refund when permits were issued to Jessie Wallace. Promptly thereafter, corresponding liquor permits were issued to Jessie Wallace and those formerly held by Fioramonte were cancelled.
*217 On August 24, 1949, Abraham reduced to judgment the cognovit note for $38,000, which had been executed by Fioramonte and Charles Wallace. In October 1949, levy was made under that judgment upon all specific items of property belonging to the Anchor Cafe, which were included in the mortgage, and those items were seized by the sheriff. That action upon the note was independent of the present action and the levy did not purport to include either the leasehold estate or the liquor permits.
On September 30, 1949, the owners of the property occupied by the cafe, who were the lessors in the original lease above referred to, executed a new lease to Jessie Wallace as lessee. It made no mention of the previous lease which had been held by Fioramonte. Though containing many terms similar to those in the original lease it was different in form and it was for a term of three years expiring October 1, 1952. It was not merely for the unexpired term of the former lease. The new lease contained also a provision denying the right of assignment and reading as follows:
“3. Lessee agrees that no part of said premises shall be underlet or assigned without consent, in writing, of the lessors. Any such assignment or under-letting shall constitute a forfeiture of the balance of the term herein granted at the election of the lessors. ’ ’
On November 30, 1949, the present action was instituted by Abraham against Fioramonte, Charles Wallace, Jessie Wallace and one Mary Sartori (who purported to be the holder of a second mortgage). This action is to foreclose the mortgage which was given to secure the note on which judgment had previously been taken as hereinabove recited. This petition recites the purported sale and transfer of March 31, 1949, from Fioramonte to Jessie Wallace and avers *218 that such purported sale was made with intent to defraud Abraham with respect to the property subject to the mortgage. Pending determination of the issues raised in the petition, the plaintiff requested tbe appointment of a receiver. That request was granted, a receiver was appointed and he took possession of the cafe and thereafter operated it.
Trial in the Common Pleas Court of the issues raised in this foreclosure suit terminated July 27, 1950, and its judgment was entered on that date. The court found that the purported sale by Fioramonte to Jessie Wallace in March 1949 was fraudulent. Nevertheless, that court held that subsequent to the levy which was made in October 1949 and the resulting sale of the physical property belonging to the cafe, Jessie Wallace had installed new items of property not covered by the mortgage. The trial court also held:
“The plaintiff, Abraham, is not entitled to subject to his claim the present leasehold interest in the real estate where the Anchor Cafe is now located. Such interest is the sole interest of Jessie Wallace independent and free of any claims of the plaintiff.
< Í * * *
“The defendant, Jessie Wallace, and her business, known as the Anchor Cafe, is released and discharged from any further control or claims of the receiver, and the plaintiff is barred from asserting any claim in or to any of the property now in the Anchor Cafe, the leasehold interests and permits and licenses, owned by Jessie Wallace.”
Appeal on questions of law and fact was taken to the Court of Appeals in July 1950. On August 16, 1950, an amended petition was filed in the Court of Appeals, which is substantially the same as the original petition except that it asks “that a receiver be ap *219 pointed pursuant to the provisions of General Code Section 11104 for the said Anchor Cafe; that the property described in said mortgage be sold and the proceeds thereof applied towards the satisfaction of plaintiff’s mortgage; * *' * that the said Anchor Cafe be administered by the receiver under and pursuant to the provisions of G. C. 11104 * *
A motion for appointment of a receiver to act under Section 11104 was then made and a receiver was appointed on August 31, 1950. This was the first effort made by the plaintiff to take advantage of the provisions of Section 11104.
The Court of Appeals made an extended finding of facts and an extended statement of its conclusions of law. It found that on March 31, 1949, Jessie Wallace was the owner of a half interest in the Anchor Cafe; that the purported sale at that time by Fioramonte to Jessie Wallace covered only Fioramonte’s half interest in the cafe; that the purported sale included “the assignment of the lease and the transfer of said liquor licenses” and was void; and that Jessie Wallace “holds an undivided one-half interest of the title to the Anchor Cafe including a one-half interest in said liquor licenses and a one-half interest in the current lease now existing for the premises occupied by said business in trust subject to the rights of the plaintiff.”
The Court of Appeals further found as a conclusion of law “that the plaintiff [Abraham] is entitled to have the one-half interest of Medio Fioramonte in the Anchor Cafe, now held in trust by Jessie Wallace, sold and the proceeds of said sale applied to the satisfaction of the claim of the plaintiff. To effectuate a transfer of the interest of Medio Fioramonte in the liquor license, the receiver may procure the transfer of such interest according to law to a suitable purchaser.”
*220 The order of the Court of Appeals contains, among others, the following:
“The receiver shall, according to the rules and regulations of the Ohio Board of Liquor Control, make application for and procure the transfer of the interest of Medio Fioramonte in the liquor licenses of the said Anchor Cafe to himself as receiver, and, upon the sale of the interest of Medio Fioramonte in the Anchor Cafe, the receiver shall make application for and procure the necessary transfers of the interest of Medio Fioramonte in said liquor licenses of the Anchor Cafe to the purchaser of such interest of Medio Fioramonte. * * *
C ( # * *
“It is further ordered that Jessie Wallace shall, within five days after the signing of this order, execute and deliver to the receiver an assignment of one-half (%) of all of her right, title and interest in and to the current lease to the premises occupied by the Anchor Cafe. It is further ordered that the defendant, Jessie Wallace, shall execute, at the request of the receiver, such applications and forms as may, from time to time, be necessary or required for the transfer of the interest of Medio Fioramonte in the said liquor licenses of the Anchor Cafe to the said receiver for the purposes of the sale of his interest therein as heretofore ordered.”
The foregoing findings and order of the Court of Appeals were made and entered on December 27, 1950. Subsequently in March 1951, anticipating the expiration of the liquor licenses and the necessity of application for renewal thereof, the Court of Appeals entered an order which recites its previous finding that Jessie Wallace and Medio Fioramonte are owners respectively of a one-half interest in the business of the cafe and *221 that the receiver of Fioramonte’s one-half interest is conducting the business during the pendency of this action.
The order provides further:
“* * * therefore, said receiver is hereby instructed and ordered and the defendant, Jessie Wallace, is hereby ordered to make application for the renewal of such permits with the Ohio Department of Liquor Control, and that such applications be made in the names of Jessie Wallace and Charles Schnur, receiver.
“It is further ordered that the defendant, Jessie Wallace, execute any and all documents necessary to effectuate the renewal of such permits as above ordered. ’ ’
It is manifest from the foregoing statement that the Court of Appeals, contrary to the decision of the Common Pleas Court, considered both the leasehold estate and the liquor permits as property which came under the control of the receiver and could be sold under order of the court to satisfy the judgment rendered against Fioramonte. This poses the questions submitted to this court for decision.
Did the mortgage in question cover the liquor permits and the leasehold estate when executed and, if so, did the mortgage cover the permits and lease which existed at the time of the appointments of the receivers on December 20, 1949, and on August 31, 1950, so as to give the mortgagee any right to satisfaction of his debt through levy upon or sale by court order of any interest in the permits and lease then existing?
Could any interest which Fioramonte may have had in the permits prior to March 31, 1949, or in the lease prior to September 30, 1949, be reached by an action under Section 11104, General Code, which was instituted in the Court of Appeals on August 16, 1950?
*222 The question as to whether the instrument when executed was a valid mortgage upon the lease seems not to have been seriously raised in either the trial or reviewing court but it appeals to us as of fundamental significance. The exact nature of leasehold estates has proved troublesome to courts over a long period of years. The courts have quite generally held that a lease for a term of years short of a freehold estate is not “land, tenements or hereditaments”; that it is not a chattel personal; and that it is a special form of chattel commonly referred to as a chattel real. Although possessing many characteristics of an ordinary chattel, it partakes of some of the characteristics of real property because it passes a present interest in land. See 1 Thompson on Real Property (Perm. Ed.), 67, Section 61; 3 ibid., 8, Section 1018; Brenner v. Spiegle, 116 Ohio St., 631, 157 N. E., 491; Titusville Novelty Iron Works Appeal, 77 Pa., 103.
The mortgage in question was witnessed but not acknowledged and though filed as a chattel mortgage was not recorded as a mortgage on an interest in real estate.
Section 8510, General Code, requires that a mortgage covering any estate or interest in real property must be executed in the presence of two witnesses and acknowledged before one of the designated officers.
With reference to encumbrances upon real estate, Section 8542, General Code, requires that “all mortgages, executed agreeably to the provisions of this chapter, shall be recorded in the office of the recorder of the county in which the mortgaged premises are situated, and take effect from the time they are delivered to the recorder of the proper county for record.”
Section 2757 specifies the records required to be *223 kept by the county recorder, namely, first, deeds, “second, a record of mortgages, in which shall be recorded all mortgages, or other instruments of writing by which lands, tenements, or hereditaments are or may be mortgaged, or otherwise conditionally sold, conveyed, affected or incumbered in law, ’ ’ third, powers of attorney, fourth, plats and, fifth, leases.
We conclude that the instrument was not-valid as a mortgage in respect to the leasehold estate of the mortgagor in the premises in question. This view is supported by Paine, Kendall & Co. v. Mason, 7 Ohio St., 198. See, also, Eager on Chattel Mortgages and Conditional Sales, 6, 140 and 142, Sections 5, 117 and 118; 2 Hausser on Ohio Practice, Real Property, 383, Section 3086; Freedman v. Bloomberg, 225 Mass., 491, 114 N. E., 827, L. R. A. 1917C, 628; In Re Fulton, 153 F., 664; Deane v. Hutchinson, 40 N. J. Eq., 83, 2 A., 292; McLeod v. Barnum, 131 Cal., 605, 63 P., 924.
If we were to assume that the mortgage covered the leasehold estate in the first instance, it would cover only such rights as were held by the lessee and it would not in any way affect the rights of the lessor or prevent the lessor from exercising any of the rights reserved to the lessor in the lease. The lease was nonassignable and reserved to the lessor the right to forfeit the residue of the lease in the event of underletting or assignment thereof by the lessee. If the lessee lost his lease through the exercise of any right reserved by the lessor, the lease would become nonexistent as partial security for the mortgage. In this instance the lessee surrendered his lease on September 30, 1949. The lessor accepted that surrender of the lease and thereupon executed a new and different lease to Jessie Wallace. Up to that time there had been no request for appointment of a receiver and no *224 effort had been made to procure a court order sequestering the rights of the original lessee in the lease to satisfy the debt secured by the mortgage.
Prior to the execution of the new lease to Jessie Wallace, the mortgagee had taken judgment upon his note against Fioramonte, the original lessee, but no effort had been made to levy upon the leasehold interest of Fioramonte under that judgment. The authorities are well settled that no lien under a judgment attaches to a leasehold estate until actual ievy thereon is made. The necessary conclusion is that no lien of judgment attached to the lease.
Did the plaintiff acquire any right to satisfaction of his debt through sale of the lease under the provisions of Section 11104, General Code?
The new lease was executed to Jessie Wallace long prior to the institution of any action under Section 11104 or the application for appointment of a receiver under that section. No claim is made that the owners of the premises — who were the lessors in both leases — acted other than in good faith or had any part in any fraudulent transaction. In an action under Section 11104 to seize and sell property in the hands of a third person the plaintiff could, at most, reach only property transferred to such third person by the debtor-defendant. Jessie Wallace did not hold the lease by assignment from the defendant debtor. It was issued to her directly by the owners, who were not in any way associated with the defendant debtor. Her lease was not affected by the action of the court taken subsequently to September 30, 1950, under the provisions of Section 11104, General Code.
We, therefore, agree with the conclusion reached by the Common Pleas Court that Abraham who was the mortgagee was not entitled to subject the present leasehold interest to his claim. The leasehold was *225 the sole property of Jessie Wallace and was independent and free of any claims of the plaintiff.
The conclusion of the Court of Appeals, which is contrary to that above stated, is disapproved.
We come now to the question whether the debt secured by the mortgage could be satisfied to any extent by levy upon or sale of any liquor permits at any time held by Fioramonte or by Jessie Wallace. This immediately raises the question whether in Ohio a permit to sell intoxicating liquors is merely a personal license or is property in the usual concept of that term.
The sale of intoxicating liquors in Ohio and the issuing of permits authorizing the sale thereof are controlled by the Liquor Control Act comprising Sections 6064-1 to 6064-68, inclusive, General Code. That act created the Department of Liquor Control consisting of a Board of Liquor Control of four members and a Director of Liquor Control. By it broad powers were vested in the Board of Liquor Control and the Director of Liquor Control with respect to the adoption of rules and regulations governing the sale of intoxicating liquors and the issuance, transfer, suspension, revocation and cancellation of permits to engage in such business.
Section 6064-17 contains, among others, the following provision:
“* * * No holder of a permit shall sell, assign, transfer, or pledge the permit granted, without the written consent of the Department of Liquor Control.”
Section 6064-25 specifically authorizes the Board of Liquor Control to suspend or revoke any permit for any one of a number of specified reasons including:
“3. For assigning, transferring or pledging a permit contrary to the rules and regulations of the Board of Liquor Control adopted pursuant to this act.”
Under Section 6064-20, General Code, permits are *226 limited to periods of one year and are “subject to suspension, revocation or cancellation as authorized or required by this act. ’ ’
Under the rules adopted by the Department of Liquor Control, renewals of permits are made only upon application duly filed in accordance with the rules and after showing to the satisfaction of the department of the fitness of the applicant to continue as a permit holder. Detailed analysis of the statutes and rules governing the sale of intoxicating liquors is not possible within the necessary limits of this discussion. It is uncontrovertable that the sale of intoxicating liquors is a business completely controlled in Ohio by legislation. It is not an ordinary business in which individuals may freely engage.
As previously stated by this court in the case of State, ex rel. Zugravu, v. O’Brien, 130 Ohio St., 23, 196 N. E., 664:
“Permits to carry on the liquor business which are issued under the provisions of the Liquor Control Act are mere licenses, revocable as therein provided, and create no contract or property right.”
See, also, State v. Hipp, 38 Ohio St., 199; Frankenstein v. Leonard et al., Board of Liquor Control, 134 Ohio St., 251, 16 N. E. (2d), 424; Board of Liquor Control v. Tsantles, 156 Ohio St., 512, 103 N. E. (2d), 749.
The courts of some states have held that liquor licenses or permits are property which may be subjected to claims of creditors but such decisions were rendered with respect to statutes essentially different from those in force in Ohio. In fact, some of those decisions specifically state that the conclusion would be different under laws not permitting the transfer of permits from one person to another. For example, in Degginger, Recr., v. Seattle Brewing & Malting Co., 41 Wash., 385, 83 P., 898, which held such licenses to be more than a personal privilege, the court said:
*227 “Under statutes which do not permit transfers of the license from one person to another, and where the right is a personal privilege only, we think the rule stated [that the permit is not such property as is subject to the debts of the licensee and that none of the rights secured thereby can be enjoyed by the receiver] is undoubtedly correct.”
This principle is well stated as follows in the annotation appearing in 148 A. L. R., 495:
“Wherever the courts consider a license to sell intoxicating liquors primarily as a privilege, and not a property right, they will hold it not subject to execution or attachment. Barnard v. State (1909), 158 Ala., 35, 48 So., 483; Semple v. Flynn (1887; N. J. Eq.), 10 A., 177; Walsh v. Bradley (1937), 121 N. J. Eq., 359, 190 A., 88; Re Summa (1893), 2 Pa. Dist. R., 651; Re Breen (1893), 2 Pa. Dist. R., 652; Re Ulrich (1897), 6 Pa. Dist. R., 408; Walsh v. Walper (1901), 3 Ont. L. Rep., 158 — Div. Ct.”
It is our conclusion that permits to engage in the business of selling intoxicating liquors in Ohio are not property such as can be validly covered by a mortgage, that the mortgage given by Fioramonte did not cover such permits held by him, and that liquor permits are not property which can be reached in a proceeding under Section 11104, G-eneral Code. In any event the permits held by him ceased to exist on or about March 16, 1949, when he surrendered them. At that time new permits were issued by the Department of Liquor Control to Jessie Wallace and thereafter she was the sole owner thereof. All of this occurred prior to the institution of the action upon the note which was reduced to judgment on August 24, 1949, and prior to the appointment of a receiver by the Common Pleas Court, which occurred on or about December 20, 1949. We, therefore, conclude, as did the trial court, that the plaintiff can not assert any claim *228 in or to any of the permits and licenses owned by Jessie Wallace.
For the reasons hereinabove stated, we hold that Jessie Wallace was the sole owner of the lease upon the premises in question; that she was the sole owner of the permits in question issued by the Department of Liquor Control and authorizing the sale of intoxicating liquors upon the premises; that the defendant Medio Fioramonte had no interest in said lease or permits; and that the plaintiff had no right of satisfaction of his judgment against Fioramonte through sale of said lease or permits.
The judgment of the Court of Appeals is, accordingly, reversed.
Judgment reversed.
Weygandt, C. J., Zimmerman, Stewart, Taft, Matthias and Hart, JJ., concur.